**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-7

JUSTIN MICHAEL WOLFE,

  Petitioner – Appellee,

  v.

HAROLD W. CLARKE, Director, Virginia Department of
Corrections,

  Respondent – Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk. Raymond A. Jackson, District
Judge. (2:05-cv-00432-RAJ-DEM)

Argued: January 28, 2013                     Decided: May 22, 2013

Before KING, DUNCAN, and THACKER, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the
majority opinion, in which Judge Duncan joined. Judge Thacker
wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF
VIRGINIA, Richmond, Virginia, for Appellant. Ashley Charles
Parrish, KING & SPALDING, LLP, Washington, D.C., for Appellee.
**ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General, Katherine
B. Burnett, Senior Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant.
Michele J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE
CENTER, Charlottesville, Virginia; Daniel J. King, KING &

SPALDING, LLP, Atlanta, Georgia; Daniel S. Epps, Karen F. Grohman, KING & SPALDING, LLP, Washington, D.C., for Appellee.

————————————

KING, Circuit Judge:

These habeas corpus proceedings on behalf of Justin Michael Wolfe are before us for the third time, and they arrive saddled with a protracted and eventful history. Most recently, in 2012, we affirmed the judgment entered in the Eastern District of Virginia vacating Wolfe's 2002 state court convictions for capital murder and other crimes, and we remanded for further proceedings, leaving in place the district court's remedial edict that Wolfe be retried or released.

In this appeal, respondent Harold W. Clarke, as Director of the Virginia Department of Corrections (hereinafter the "Commonwealth"), seeks relief from the district court's "Order Enforcing Judgment." Wolfe v. Clarke, No. 2:05-cv-00432 (E.D. Va. Dec. 26, 2012).[1] The court entered the challenged order upon ascertaining that the Commonwealth had not complied with the operative retry-or-release directive. As a consequence of the Commonwealth's noncompliance, it was instructed to "release [Wolfe] unconditionally, free of all criminal proceedings on the charge of murder for hire of Danny Petrole and the drug charges that were previously tried in state court by the Commonwealth, within ten (10) days of the entry of this order." Id. at 25.

---

[1] The Order Enforcing Judgment is found at J.A. 510-35. (Citations herein to "J.A. ____" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

3

Beyond mere release, however, the district court further proscribed the Commonwealth "from reprosecuting [Wolfe] on the charges originally tried herein in state court or any other charges stemming from [the] death of Danny Petrole which requires the testimony of Owen Barber in any form." Order Enforcing Judgment 25-26. In support of its chosen remedy, the court concluded that the Commonwealth's prosecutors had, on remand, improperly conducted themselves with respect to their key witness, Owen Barber. As a result, the prosecutors had "permanently crystalized" constitutional violations previously found to have tainted Wolfe's trial, id. at 24, which in turn constituted extraordinary circumstances justifying a federal bar to his proposed retrial.

On January 3, 2013, we stayed, pending resolution of this appeal, the district court's order. As explained below, the court accurately determined that the Commonwealth neglected to timely observe the retry-or-release directive. Though the court was correct to order Wolfe's immediate release, it fashioned an overbroad remedy and thereby abused its discretion by precluding the Commonwealth from retrying Wolfe in a new proceeding. We therefore vacate the Order Enforcing Judgment and remand for the district court to enter a substitute order directing that Wolfe simply be released from the custody imposed as the result of his 2002 convictions.

I.

As described in our earlier decisions, a jury in Prince William County, Virginia, found Wolfe guilty in 2002 of the capital murder of Danny Petrole, of using a firearm in the commission of a felony, and of conspiring to distribute marijuana. See Wolfe v. Johnson, 565 F.3d 140 (4th Cir. 2009) ("Wolfe I"); Wolfe v. Clarke, 691 F.3d 410 (4th Cir. 2012) ("Wolfe II"). The theory of the prosecution was that, as a nineteen-year-old marijuana dealer, Wolfe hired his friend and fellow drug dealer, Owen Barber, to murder Petrole, who was a drug supplier. Barber, the admitted triggerman, was the only witness to testify concerning the "for hire" element of the murder-for-hire scheme. In exchange for Barber's testimony, the Commonwealth dismissed its capital murder charge against him. Barber thus pleaded guilty and was sentenced to sixty years on a non-capital murder conviction, of which twenty-two years were suspended. On the basis of his murder conviction, Wolfe was sentenced to death. For his firearm and drug convictions, Wolfe received consecutive prison terms of three and thirty years, respectively.

A.

1.

5

In November 2005, after failing to obtain relief on direct appeal and in state post-conviction proceedings, Wolfe filed his 28 U.S.C. § 2254 petition in the Eastern District of Virginia. The district court promptly referred Wolfe's petition to a magistrate judge for a report and recommendation. On December 14, 2005, while Wolfe's petition was pending, Barber executed an affidavit repudiating his trial testimony and exculpating Wolfe from the murder-for-hire scheme. Barber's affidavit prompted Wolfe to file an amended § 2254 petition, which is the operative "petition" in these proceedings. The petition maintained, inter alia, that the prosecution had curtailed Wolfe's entitlement to due process by concealing material exculpatory evidence that should have been disclosed to his defense attorneys. The petition also alleged that Barber's affidavit had sufficiently demonstrated Wolfe's actual innocence to excuse any procedural default of his constitutional claims.

In April 2006, five months after executing the repudiatory affidavit, Barber sought to recant the statements he had made therein. In an unsworn handwritten letter, Barber insisted that he had testified truthfully in the 2002 trial, and that he had falsified his 2005 affidavit. In August 2007, the magistrate judge issued his report recommending dismissal of Wolfe's § 2254 petition, in that the claims alleged therein were meritless and had been procedurally defaulted. On February 11, 2008, over

6

Wolfe's objections, the district court adopted the magistrate judge's recommendation and dismissed the petition. Wolfe timely appealed that dismissal, and, by our decision of May 11, 2009, see Wolfe I, we vacated in part and remanded for further proceedings.

2.

On remand, the district court determined at the outset that Wolfe was entitled to an evidentiary hearing, and that, pursuant to Schlup v. Delo, 513 U.S. 298 (1995), he had made a sufficient showing of actual innocence to bypass any procedural defenses that might be interposed to foreclose substantive consideration of his constitutional claims. During the evidentiary hearing conducted in November 2010, Barber testified, exculpated Wolfe, and his evidence was credited by the court. On July 26, 2011, the court ruled that the prosecutors in Wolfe's trial had contravened his Fourteenth Amendment due process rights by (1) failing to disclose favorable and material evidence, contrary to Brady v. Maryland, 373 U.S. 83 (1963); (2) allowing Barber to testify, despite having information indicating that his testimony was false, in violation of Napue v. Illinois, 360 U.S. 264 (1959); and (3) striking a qualified venireman, as proscribed by Supreme Court precedent. The court therefore granted habeas corpus relief to Wolfe and specified that Wolfe's "conviction and sentence" were vacated. Wolfe v. Clarke, 819 F.

Supp. 2d 538, 574 (E.D. Va. 2011). On August 4, 2011, the Commonwealth filed a timely notice of appeal.

Thereafter, Wolfe moved the district court, pursuant to Rule 59 of the Federal Rules of Civil Procedure, to clarify whether the relief granted on his capital murder conviction also encompassed his firearm and drug convictions. On August 30, 2011, the court granted Wolfe's clarification motion and entered one of the orders relevant to this appeal. See Wolfe v. Clarke, No. 2:05-cv-00432 (E.D. Va. Aug. 30, 2011) (the "Relief Order").[2] The Relief Order explained that Wolfe was entitled to a new trial on all of the original charges, and it accorded the Commonwealth the option of either "provid[ing] [Wolfe] with a new trial, or releas[ing] him unconditionally from custody" within 120 days. Id. at 2. On September 2, 2011, the Commonwealth filed a second notice of appeal, from the Relief Order and the Amended Judgment. Eleven days later, the Commonwealth moved the district court for a stay pending appeal, which the court granted on November 22, 2011. See Wolfe v. Clarke, 819 F. Supp. 2d 574 (E.D. Va. 2011) (the "Stay Order").[3]

_____

[2] On August 30, 2011, the district court also entered an Amended Judgment containing substantially identical disposition terms as the Relief Order. These documents are found at J.A. 91-93.

[3] A brief comment is warranted concerning the two notices of appeal filed by the Commonwealth in Wolfe II. Generally
(Continued)

8

Wolfe cross-appealed, asserting that the district court erred in denying him relief on an additional, unadjudicated claim. By our Wolfe II decision, we affirmed the judgment of the district court.[4]

B.

1.

Our mandate in Wolfe II issued on September 7, 2012. That same day, Wolfe was transferred from the Sussex State Prison to

---

speaking, a duly filed notice of appeal deprives a district court of jurisdiction over all issues relating to the subject matter thereof. See In re Grand Jury Proceedings Under Seal, 947 F.2d 1188, 1190 (4th Cir. 1991). An exception to that general proposition is recognized when a district court elects "to proceed as to matters in aid of the appeal." Id. A court may render such aid, for example, by resolving a motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the judgment being appealed, see Fed. R. App. P. 4(a)(4)(A)(iv) (providing in addition that filing of Rule 59(e) motion resets time allotted all parties to submit notices of appeal), or by addressing in the first instance a motion for stay pending appeal, see Fed. R. App. P. 8(a)(1)(A). Both of those events occurred in Wolfe II, culminating in, respectively, the Relief Order with accompanying Amended Judgment, and the Stay Order.

[4] Our affirmance in Wolfe II of the Relief Order and Amended Judgment was predicated on one sub-part of Wolfe's Brady claim, that is, the Commonwealth's failure to disclose the written police report of Prince William County Detective Sam Newsome, documenting that Newsome had advised Barber that he could avoid the death penalty by implicating Wolfe. Because Wolfe was entitled to relief under § 2254 on that sub-claim, we had no reason to review the Commonwealth's assignments of error regarding the other grounds for relief, or to consider Wolfe's cross-appeal. See Wolfe II, 691 F.3d at 416-17.

9

the Prince William County Adult Detention Center, for a status hearing to be conducted in the state circuit court on September 10, 2012. At that hearing, two of Wolfe's federal habeas lawyers were appointed to represent him on the original state charges, and a bond hearing was set for September 14, 2012.[5] The next day, the Commonwealth's Attorney and his assistant, along with one of the primary investigating officers, Detective Sam Newsome, interviewed Barber at the Augusta Correctional Center. During the interview, which was recorded without Barber's knowledge, those three officials sought to ascertain how Barber would testify at Wolfe's retrial. They suggested to Barber that, because his testimony in the federal habeas proceedings was inconsistent with his trial testimony, he had breached his plea agreement with the Commonwealth. The prosecutors then advised Barber that he could face prosecution for perjury, plus reinstatement of his original capital murder charge, which potentially carried the death penalty.

Not long thereafter, the Commonwealth's Attorney and his assistant recused themselves from Wolfe's retrial and requested

_____

[5] When it became clear that the Commonwealth intended to proceed with a retrial of Wolfe, his habeas counsel successfully moved to withdraw from their representation of him on the original state charges. They were replaced by the Regional Capital Defender, who presently represents Wolfe in the state criminal proceedings.

the appointment of Raymond Morrogh, the Commonwealth's Attorney for Fairfax County, as Special Prosecutor. Morrogh was appointed, and he represented the Commonwealth at the September 14, 2012 hearing, where Wolfe was denied bond. On that occasion, the defense lawyers asserted that only thirty-six days remained for the Commonwealth to retry Wolfe. The Commonwealth agreed to a retrial beginning on October 15, 2012. On the heels of the bond hearing, Wolfe requested the circuit court to disqualify the Special Prosecutor.

In the meantime, on October 1, 2012, a Prince William County grand jury returned new indictments against Wolfe, charging him with six additional offenses arising from the events underlying Wolfe's original charges. The retrial, then, was to encompass the original charges plus the following:

- capital murder by order of a person engaged in a continuing criminal enterprise ("CCE");

- use of a firearm in the commission of a murder;

- leading a CCE to distribute between $100,000 and $250,000 worth of marijuana in a twelve-month period;

- leading a CCE to distribute more than $250,000 of marijuana in a twelve-month period;

- first degree felony murder of Danny Petrole during commission of a robbery or attempted robbery; and

- use of a firearm in the commission of a robbery or attempted robbery.

11

See J.A. 229-30. On that same date, the Commonwealth moved in state court for a continuance of the October 15 retrial, asserting that the 120-day period had not begun to run until our mandate issued on September 7, 2012, and, thus, that the 120 days would not expire until January 5, 2013. Consistent with that view, the Commonwealth requested that the retrial commence the first week of January 2013. The continuance motion was granted on October 3, 2012, but a retrial date was not set.

On October 31, 2012, the circuit court conducted a hearing on, inter alia, Wolfe's motion to disqualify the Special Prosecutor. Barber was called to testify at that hearing, and he invoked his Fifth Amendment privilege against self-incrimination. The court accepted Barber's assertion of the privilege and did not seek to compel his testimony. Thereafter, the court scheduled Wolfe's retrial for January 2, 2013.[6]

Meanwhile, beginning in November 2012, proceedings commenced in federal court that overlapped to some extent with the pretrial litigation in the circuit court. Specifically, on November 16, 2012, Wolfe filed a motion to enforce judgment,

---

[6] On this record, it is not clear when and how Wolfe's lawyers learned of the Barber interview. At least as early as the October 31, 2012 hearing, however, they were aware of Barber's apparent intention to invoke the Fifth Amendment in connection with Wolfe's retrial, and they knew that such invocation was related to Barber's interview by the prosecutors.

12

asserting that the Commonwealth had neither released him unconditionally nor provided him with a new trial within 120 days of the Relief Order. The Commonwealth opposed the motion, contending that Wolfe had already been released unconditionally, and that, by conducting the bond hearing on September 14, 2012, the Commonwealth had effectively commenced his retrial within the 120-day period. That period, the Commonwealth maintained, had in any event been reset to 120 days by the November 22, 2011 Stay Order, and had not begun to elapse until September 7, 2012, upon issuance of our mandate.

2.

On December 4, 2012, based primarily on the Barber interview, Wolfe filed a motion to dismiss in the circuit court, contending that, by threatening Barber with the death penalty, the prosecutors had engaged in "gross prosecutorial misconduct" sufficiently severe and violative of due process to fatally undermine all the state criminal charges lodged against Wolfe.[7] See J.A. 405-20. Two days later, Wolfe brought the Barber

_____

[7] At the oral argument of this appeal, the Commonwealth's lawyer represented that the circuit court elected to defer ruling on Wolfe's motion to dismiss the indictments on the basis of, inter alia, the Barber interview. According to the Commonwealth, the circuit court was of the view that the motion was premature because Barber has not yet invoked the Fifth Amendment and declined to testify in Wolfe's retrial. The motion to dismiss thus remains pending in the circuit court.

interview to the district court's attention, by way of his written reply on the motion to enforce judgment. Wolfe also offered to provide a transcript of the Barber interview "to the Court at its request." Id. at 285. The following day, the district court directed Wolfe's counsel to file "any additional information or transcripts concerning the meeting between the original prosecutors in this case and Mr. Barber on September 11, 2012." Id. at 290. Acting on its own initiative, the court also ordered the Commonwealth to show cause why the Barber interview "does not constitute extraordinary circumstances warranting the Court to order [Wolfe's] immediate release and bar current and future prosecutions of Wolfe on all charges related to the death of Danny Petrole and drug conspiracy crimes." Id. at 289-90. The Commonwealth responded to the show cause order on December 12, 2012, asserting that the district court possessed no authority to prohibit any current or future state prosecutions of Wolfe, and that, even were the situation otherwise, nothing had occurred in the Barber interview to justify any such action.

The district court conducted an evidentiary hearing on December 13, 2012, concerning the show cause order. On that occasion, Barber's lawyer advised that Barber would not testify in Wolfe's retrial, instead relying on his Fifth Amendment privilege. The court itself called Barber as a witness at the

14

hearing, for the purpose of establishing that the September 11, 2012 interview had been recorded without his knowledge. Barber responded to the court's questions, confirming that he had been unaware that the encounter was recorded.

3.

On December 26, 2012, the district court entered its Order Enforcing Judgment, concluding that the Commonwealth had not satisfied either compliance option specified in the Relief Order, that is, Wolfe had not been released unconditionally, and he had not been retried within 120 days of the Relief Order. In discussing the appropriate remedy for the violation, the court surmised that "had the content of [Wolfe's] Motion to Enforce Judgment been strictly limited to the Commonwealth's violation of the deadline set in this case, . . . [t]he Court would order Wolfe's release, but he would be subject to rearrest and reprosecution by the Commonwealth." Order Enforcing Judgment 16. Moving on to the matter of the Barber interview, the court determined that "extraordinary circumstances" had been shown warranting a bar to Wolfe's retrial. More specifically, the court found that the Barber interview "incurably frustrated the entire purpose" of the federal habeas corpus proceedings, and "permanently crystalized" the constitutional violations infecting Wolfe's trial, causing Barber to be legally unavailable to testify in a retrial. Id. at 24.

Consequently, the district court ordered Wolfe's release within ten days and barred the Commonwealth from reprosecuting Wolfe on the original charges "or any other charges stemming from [the] death of Danny Petrole which requires the testimony of Owen Barber in any form." Order Enforcing Judgment 25-26. The Commonwealth immediately appealed, moving to stay the Order Enforcing Judgment. On January 3, 2013, the district court denied the Commonwealth's request for a stay pending appeal. Later that same day, however, on the Commonwealth's motion, we entered our own stay and expedited this appeal. We possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).[8]

## II.

We potentially face two rather significant issues. First, we must assess whether the Commonwealth complied with the Relief Order. If the Commonwealth failed to do so, we must then decide whether the district court abused its discretion in barring Wolfe's retrial.

On the first issue, we review a district court's interpretation of its own orders for abuse of discretion. Home

---

[8] In connection with the entry of our January 3, 2013 stay pending appeal, we directed the parties to file regular reports on the status of the related state court proceedings. The most recent status report indicates that a trial date remains unscheduled.

16

Port Rentals, Inc. v. Ruben, 957 F.2d 126, 131 (4th Cir. 1992). In that regard, "we are obliged to accord substantial deference to a district court's interpretation of its own judgment." ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co., 472 F.3d 99, 113 (4th Cir. 2006). Indeed, "to sustain appellate review, district courts need only adopt a reasonable construction of the terms contained in their orders." JTH Tax, Inc. v. H & R Block E. Tax Serv., Inc., 359 F.3d 699, 706 (4th Cir. 2004).

If the Commonwealth falls short on the compliance issue, our review of the district court's bar to Wolfe's retrial is also for abuse of discretion. D'Ambrosio v. Bagley, 656 F.3d 379, 390 (6th Cir. 2011). Where applicable, Congress has directed the courts to dispose of habeas corpus petitions "as law and justice require." 28 U.S.C. § 2243.[9] Congress's directive constitutes, in a proper case, "an authorization to adjust the scope of the writ in accordance with equitable and prudential considerations." Danforth v. Minnesota, 552 U.S.

---

[9] More fully, a court considering an application for habeas corpus relief "shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. Notably, the § 2243 standard only applies when deference to a state court's adjudication of the merits of a habeas corpus claim is not mandated by the Antiterrorism and Effective Death Penalty Act. See Johnson v. Thurmer, 624 F.3d 786, 791 (7th Cir. 2010). Because this appeal does not implicate the merits of a habeas claim, there is no state court adjudication to which we would defer.

264, 278 (2008). Because "habeas corpus is, at its core, an equitable remedy," a district court is vested with substantial discretion to appropriately redress any violation of an order granting habeas corpus relief. Schlup v. Delo, 513 U.S. 298, 319 (1995).

## III.

### A.

In view of the foregoing recitation, we turn first to the Commonwealth's assertion that it complied with the district court's Relief Order, which required that Wolfe be retried or released within 120 days. Those contentions — that Wolfe was both released and retried — were considered and rejected in the Order Enforcing Judgment. The court's rulings were predicated primarily on its explanation of its intentions with respect to the Relief Order and the Stay Order. As explained below, the district court did not abuse its discretion in ruling that the Commonwealth neglected to satisfy either compliance option.

### 1.

At the threshold, the Commonwealth's position — that Wolfe has been both released and retried — fails to pass muster. By specifying the compliance options in the disjunctive, the district court presented the Commonwealth with a choice: it could either provide Wolfe with a new trial or unconditionally

18

release him from custody. The Commonwealth asserts on appeal, rather counterintuitively, that it has satisfied both options.

First, the Commonwealth maintains that, at least since Wolfe's September 14, 2012 bond hearing, his status is that of a pretrial defendant who has been denied bond. The Commonwealth thus posits that Wolfe was unconditionally released. The Commonwealth's theory fails to take into account the purpose of a new-trial contingency in the habeas setting, which is to delay actual release of the successful petitioner, thus permitting the state authorities to remedy the constitutional defects and retain the petitioner in confinement. See Hilton v. Braunskill, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.").

By its Relief Order, the district court did not direct Wolfe's immediate release. It instead accorded the Commonwealth the options of retrying Wolfe within 120 days or unconditionally releasing him. An evaluation of whether the Commonwealth has complied with either directive requires an interpretation of the court's prior orders, the best source for which is the court itself. As it explained,

> [i]n presenting the option of releasing the Petitioner "unconditionally" from custody, the Court used the word "unconditionally" in its traditional and widely

19

underst[ood] context: "Not limited by a condition; not depending on an uncertain event or contingency; absolute." Black's Law Dictionary (9th ed. 2009). Under this meaning of the word "unconditional," it is self-evident that releasing Petitioner from the custody of the Virginia Department of Corrections to Prince William County for the purposes of retrial did not constitute releasing Petitioner "unconditionally from custody."

Order Enforcing Judgment 8.

The foregoing explanation is not an unreasonable one, and we are unable to disturb it. A commonsense reading of the Relief Order is that it obliged the Commonwealth to either release or retry Wolfe within 120 days. Because Wolfe has not been unconditionally released, we turn to the second compliance option and gauge whether Wolfe has been retried.[10]

2.

_____

[10] The Commonwealth also makes a related, though necessarily distinct, assertion that the vacatur of Wolfe's convictions deprived the district court of jurisdiction. Upon reviewing this issue de novo, see United States v. Poole, 531 F.3d 263, 270 (4th Cir. 2008), we conclude that the court possessed jurisdiction to enforce its judgment. Because Wolfe was in custody when the original petition was filed, the jurisdictional contention is really a mootness argument that is foreclosed by Carafas v. LaVallee, 391 U.S. 234 (1968) (challenge to conviction not rendered moot by habeas petitioner's unconditional release, because petitioner suffers from "collateral consequences," including disenfranchisement, ineligibility for jury duty, and disqualification from elected office). See also Maleng v. Cook, 490 U.S. 488 (1989) (Carafas rested "on the fact that the petitioner had been in physical custody under the challenged conviction at the time the petition was filed").

20

The Commonwealth's other option for compliance with the Relief Order was to provide Wolfe with a new trial "within one-hundred and twenty (120) days of the date of [the Order]." Relief Order 2. The Commonwealth insists that it was not obliged to actually complete a retrial within 120 days. That is, it was not necessary for a verdict to be returned in the state court, or even that a jury be selected, so long as proceedings leading to a retrial had commenced in the circuit court. In this regard, the Commonwealth emphasizes that the circuit court had conducted a bond hearing on September 14, 2012, and that other pretrial proceedings (such as motions to dismiss the indictments and disqualify the prosecutor) were ongoing until the Order Enforcing Judgment was entered. The Commonwealth thus maintains that its obligation to "provide [Wolfe] with a new trial" was thereby satisfied. In the alternative, the Commonwealth suggests that the 120-day retrial period did not begin to run until the issuance of our mandate in Wolfe II, on September 7, 2012.

Each of the foregoing contentions were considered and rejected by the district court, predicated on its interpretations of the orders on appeal. With regard to whether the 120-day retrial period ran from the issuance of our mandate, the court explained that

21

the stay [entered on November 22, 2011] pending the Commonwealth's appeal of the Court's Amended Judgment paused or halted the 120-day deadline imposed by the Court to provide Wolfe a new trial. When that stay was lifted [on September 7, 2012], the deadline clock resumed where it left off when the stay was granted and there were 36 days remaining. On Saturday, October 13, 2012, the 120 days given to the Commonwealth to provide Wolfe with a new trial expired. Because the deadline fell on a weekend, the deadline for retrial moved to Monday, October 15, 2012.

Order Enforcing Judgment 11.[11] In response to the second contention, that the obligation to provide Wolfe with a new trial was satisfied by the commencement and conduct of pretrial proceedings in the circuit court, the Order Enforcing Judgment specified that the retrial had to be completed — and not merely

---

[11] It is apparent that the Commonwealth was aware, as early as September 13, 2011, that the district court could deem the 120-day retrial period to have run concurrently with the appeal in Wolfe II. In a memorandum filed that day in support of its motion for a stay pending appeal, the Commonwealth assumed that the 120-day period had already begun, opining that

> [i]n the absence of a stay, the Order would take effect and the Commonwealth would be either burdened with a new capital trial or required to set Wolfe free without a trial. In either instance, the Director would be prevented from exercising his right of appeal.

J.A. 113. The subsequent Stay Order seems to have been based upon the same assumption, see Wolfe v. Clarke, 819 F. Supp. 2d at 583 (noting that, without a stay, the 120-day period would expire before the Commonwealth's reply brief was due to this Court in Wolfe II). The Commonwealth was therefore cognizant of the 120-day issue during the pendency of the Wolfe II appeal, yet failed to bring it to our attention.

22

commenced — within the prescribed period.  More precisely, the court explained that

> it was certainly the objective of the Court in issuing [the Relief Order] that [Wolfe] would be either promptly retried or relieved of the strictures imposed by his constitutionally flawed conviction and it was certainly the intention of the Court that in providing [Wolfe] a new trial within 120 days, said trial actually occur within that period of time.

Id. at 14 (quotation marks and alterations omitted).

The Commonwealth complains that, evaluated together, the district court's interpretation of its prior directives left the prosecution, after the Wolfe II mandate, with only thirty-six days to complete a capital murder trial.  According to the Commonwealth, the Order Enforcing Judgment was a "prejudicial, revisionist rewording of [the] judgment."  Br. of Appellant 24. That characterization fails to recognize that, in the referenced order, the district court explained the meaning of its earlier orders as intended upon entry, without regard for post-judgment events.  It was the Commonwealth that sought (and now seeks from this Court) a recasting of the district court's rulings on the basis of subsequent procedural developments.  See Capps v. Sullivan, 13 F.3d 350, 353 (10th Cir. 1993) (remanding for district court "to give effect to its original understanding of the order granting [habeas relief]" (emphasis added)).

Notwithstanding the foregoing, the Commonwealth may well be correct that completing a retrial of a complex death penalty

23

case within thirty-six days was a practical impossibility. Indeed, that fact alone may have been sufficient to justify an extension of the retrial period. The Commonwealth did not, however, return to court seeking either a clarification or an extension.

We also recognize that the district court's explanation of its 120-day period was a highly restrictive one, and that, in the absence of a thorough explanation, the court's construction of that directive could be viewed as erroneous. By way of example, the court counted against the Commonwealth an aggregate of eighty-four days during the pendency of the Wolfe II appeal. That is, the period from the August 30, 2011 Relief Order through the November 22, 2011 Stay Order was counted against the 120-day retrial period, notwithstanding the Commonwealth's timely filing, on September 2, 2011, of its second notice of appeal. Furthermore, the district court did not consider that the circuit court, subsequent to the Wolfe II mandate, spent a substantial period of time addressing motions interposed by Wolfe. Even the federal Speedy Trial Act, which the district court administers on a regular basis, excludes such periods of time. See 18 U.S.C. § 3161(h) (excluding from speedy trial calculations, inter alia, "delay resulting from any pretrial motion").

24

Additionally, before concluding that the Commonwealth had failed to comply with the Relief Order, the district court acknowledged that there is a "lack of clear controlling case law on a number of issues." Order Enforcing Judgment 7. In these circumstances, we are obliged to provide a modicum of clarity: When a district court awards habeas relief, it is preferable that its order include language ensuring that the respondent will suffer no prejudice by exercising its right of appeal. See, e.g., Tice v. Johnson, 3:08-cv-00069 (E.D. Va. Nov. 19, 2009) ("The writ of habeas corpus will be GRANTED if the Commonwealth of Virginia does not commence the retrial . . . within 120 days of the date of entry of this judgment should appeal not be taken, or within 120 days after the final resolution of any appeal (including a petition for a writ of certiorari) if an appeal is taken.").

At this stage of these proceedings, however, with the Commonwealth having foregone any opportunity to obtain clarification from this Court or the district court, it can hardly claim surprise.[12] Furthermore, the district court has

---

[12] In Williams v. Netherland, a decision relied on by the Commonwealth, an issue similar to that presented here was avoided when the Commonwealth's Attorney in that case did what should have been done here: He returned to the habeas court, in advance of the court-ordered deadline, and requested an extension of time. See No. 3:96-cv-00529 (E.D. Va. Nov. 14, 2002).

25

explained its intentions with respect to the Relief Order and the Stay Order, and we are inclined to credit those explanations. Because the Commonwealth failed to either retry or release Wolfe within 120 days, we turn to the remedy for that transgression.

## B.

The Commonwealth contends that the district court abused its discretion in barring Wolfe's retrial. Though we reiterate that a federal habeas court possesses substantial discretion in fashioning an appropriate remedy, preventing the retrial of a state criminal case is the strongest of medicine. And it is a measure that should be utilized with the utmost restraint, only in the most extraordinary of circumstances. See Gilliam v. Foster, 75 F.3d 881, 905 (4th Cir. 1996) (en banc) ("Equitable federal court interference with ongoing state criminal proceedings should be undertaken in only the most limited, narrow, and circumscribed situations."). Such limited and narrow circumstances are simply not present here. We are therefore constrained to conclude, as explained below, that the district court abused its discretion in barring Wolfe's retrial.

## 1.

In support of its chosen remedy, the district court correctly recognized that the award of an unconditional writ does not, in and of itself, preclude the authorities from

rearresting and retrying a successful habeas petitioner. As the court acknowledged,

> [i]t is generally recognized that a violation of a court's directive to retry a habeas petitioner within a certain amount of time would permit the court to order the prisoner's release, however, "the granting of an unconditional writ in this circumstance will not, itself, generally preclude the government from rearresting and retrying the prisoner."

Order Enforcing Judgment 15 (quoting Federal Habeas Manual § 13:10 (May 2010)). The court, however, identified an exception to the general rule, namely, that "in extraordinary circumstances . . . a habeas court may forbid reprosecution." Id. (citing Satterlee v. Wolfenbarger, 453 F.3d 362, 370 (6th Cir. 2006)).

In detecting the presence of extraordinary circumstances here, the district court explained that the conduct of the prosecutors — in particular, their conduct during the September 11, 2012 Barber interview — "sp[oke] to a continuing pattern of violating [Wolfe's] right to use Brady and Giglio evidence, which the court attempted to remedy through its habeas decree." Order Enforcing Judgment 19. At the core of the court's analysis was its belief that the prosecutors had "incurably frustrated the entire purpose" of habeas corpus and had "permanently crystalized" the constitutional violations by "scar[ing] Barber into invoking his Fifth Amendment right to avoid self-incrimination." Id. at 24.

27

The district court's conclusion concerning the availability of Barber's testimony at a retrial, however, is speculative. As an initial matter, Barber could decide on his own to testify, and — based on his track record — such evidence might provide support for either side.[13]  And, under a proper grant of immunity, Barber's testimony may well be compelled. See Kastigar v. United States, 406 U.S. 441 (1972) (holding that Fifth Amendment privilege may be supplanted and witness compelled to testify by proper grant of immunity). Alternatively, the state trial court, by way of example, could determine that a waiver of Barber's Fifth Amendment privilege has already been made; it could authorize the evidentiary use of Barber's prior statements in one form or another; or it might craft any number of other remedies.  Put simply, the task of conducting Wolfe's retrial is for the state trial court, and it is not for us to express a view on how that court should manage its affairs.  We are confident that the retrial will be properly handled, and, if convictions result, that the appellate courts will perform their duties.

---

[13] The district court apparently believed it "unlikely that the Commonwealth would grant immunity to Barber so that he could provide testimony to exonerate [Wolfe]."  Order Enforcing Judgment 25 n.6.  Nevertheless, the Commonwealth asserts that it has offered Barber immunity for his truthful testimony at trial. Br. of Appellant 35.

The district court also speculated that the Barber interview served to deprive Wolfe's defense of a credible trial witness, and thereby abridged Wolfe's due process rights. See Order Enforcing Judgment 24 (citing United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991) ("Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to substantial government interference with a defense witness' free and unhampered choice to testify." (internal quotation marks omitted))). Like other constitutional issues that may arise in a post-habeas retrial, however, contentions relating to Barber's alleged intimidation by the prosecutors are yet to be exhausted in the state court system. See Pitchess v. Davis, 421 U.S. 482 (1975) (alleged post-habeas Brady violation subject to state court exhaustion). Indeed, Wolfe has already raised that precise issue before the circuit court in his yet-unresolved post-Wolfe II motion to dismiss the indictments. By barring Wolfe's retrial, the district court has deprived the circuit court of the opportunity to address that motion. Notably, in the event Wolfe is acquitted, any such issues would be moot. And, should Wolfe be again convicted, the state court system might vindicate him on appeal. Failing that, Wolfe's due process claim with respect to the Barber interview could, at the

29

proper time, constitute a separate ground for federal habeas corpus relief.

At the end of the day, any scenario presenting circumstances sufficiently extraordinary to warrant federal interference with a State's reprosecution of a successful § 2254 petitioner will be extremely rare, and will ordinarily be limited to situations where a recognized constitutional error cannot be remedied by a new trial. See, e.g., Blackledge v. Perry, 417 U.S. 21, 31 (1974) (holding that vindictive prosecution could contravene due process and justify bar to retrial); Barker v. Wingo, 407 U.S. 514, 522 (1972) (concluding that dismissal may be appropriate remedy for Sixth Amendment speedy trial violation); Gilliam, 75 F.3d at 881 (barring state retrial on double jeopardy grounds).[14]

Put succinctly, the constitutional claims for which Wolfe was awarded habeas corpus relief are readily capable of being remedied in a new trial. Our resolution of the Wolfe II appeal never contemplated the possibility of a retrial bar, and we expected a trial — if that option were pursued — to occur

_____

[14] There are limited situations where a state criminal retrial could properly be barred by a habeas court on the basis of a constitutional deprivation. See generally 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 33.2 (identifying decisions involving, inter alia, double jeopardy, insufficient evidence, ex post facto violation, and unconstitutional statute).

within a reasonable time. The resolution of criminal proceedings on their merits, before the public eye, is of critical importance to our system of justice. And it has long been settled that "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge[s] on the[ir] merits." Costello v. United States, 350 U.S. 359, 363 (1956) (footnote omitted). We emphasize, however, that Wolfe, like any accused — as well as the Commonwealth — is entitled to a fair trial. That very proposition is what the Wolfe II decision is all about. As has been emphasized, "[a] murder trial — indeed any criminal proceeding — is not a sporting event." Giles v. Maryland, 386 U.S. 66, 102 (1967) (Fortas, J., concurring).

The district court, in its Order Enforcing Judgment, relied on decisions where a bar to retrial was approved even though the constitutional errors could have been thereby remedied. See Satterlee, 453 F.3d at 370 (barring retrial deemed appropriate "when the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial" (internal quotation marks omitted)); Capps, 13 F.3d at 350 (barring retrial appropriate where state neither retried petitioner nor sought stay of habeas writ). Although we do not exclude the possibility that a federal habeas court — in

31

an extremely rare and unique circumstance — might proscribe a state court retrial even though the constitutional violation could be thereby remedied, we are unwilling to embrace the principles of Capps or Satterlee. In the absence of extraordinary circumstances, the proper disposition is generally, as the district court recognized, the release of a successful habeas petitioner, subject to rearrest and retrial.[15]

IV.

Here, of course, the district court was correct to order Wolfe's "release" on the original charges, though such action did not actually free him from custody. As we have explained,

---

[15] The Commonwealth alternatively contends that the retrial bar was foreclosed by Younger v. Harris, 401 U.S. 37 (1971), and the Anti-Injunction Act, 28 U.S.C. § 2283. Pursuant to Younger, a federal court "may intervene in state criminal proceedings, either by way of declaratory relief or by injunction, only when there has been a 'showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief.'" Gilliam, 75 F.3d at 903 (quoting Younger, 401 U.S. at 54). The Anti-Injunction Act provides, in pertinent part, that

> [a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283. Because the district court abused its discretion in barring Wolfe from being retried in state court, we need not reach or address the Commonwealth's contentions regarding the principles of Younger and the Anti-Injunction Act.

32

Wolfe is facing multiple indictments in Prince William County, and he has been rearrested and denied bail. All that remains to effect Wolfe's release in compliance with the alternatives contemplated by our Wolfe II decision (and by the district court in its grant of relief) is for the Commonwealth to expunge Wolfe's 2002 criminal convictions and to take any and all additional steps necessary to nullify any material adverse legal consequences attendant to those convictions. Subsequent to or contemporaneously therewith, the Commonwealth may retry Wolfe on the original charges together with the new charges, in accordance with such plan and schedule that the state circuit court may devise.

Pursuant to the foregoing, we vacate the district court's Order Enforcing Judgment and remand with instructions that the court enter a substitute order directing that Wolfe be released from the custody imposed as the result of his 2002 convictions, and, further, that those convictions be expunged and their legal effects nullified consistently with Wolfe II and this opinion. The order on remand shall be without prejudice to a retrial of the original charges against Wolfe, and it shall not preclude the conduct of such other and further proceedings in the state or federal courts as may be appropriate.

VACATED AND REMANDED

33

THACKER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusion that the Commonwealth failed to satisfy the terms of the district court's conditional writ in this case, as set forth in Part III.A. of the majority opinion. I cannot, however, agree with its conclusion that the district court abused its discretion in barring re-prosecution of Justin Wolfe -- an appropriate remedy in my view, in light of the Commonwealth's continued misconduct and resulting threat to Justin Wolfe's constitutional right to a fair trial.

The majority does not "exclude the possibility that a federal habeas court -- in an extremely rare and unique circumstance -- might proscribe a state court retrial even though the constitutional violation could be thereby remedied," but it is "unwilling to embrace" that principle in this case. Ante at 31-32 (emphasis added). I am willing to do so; in fact, for the reasons that follow, the extremely rare and unique circumstances of this case command a bar on re-prosecution. The Commonwealth's misconduct has continued far too long, and the cumulative misconduct permeating this case has tainted it in such a way that it is doubtful Wolfe will receive a fair and just trial. Enough is enough.

34

Accordingly, and for the reasons set forth herein, I dissent as to Part III.B.

## I.

The Supreme Court of the United States has stated, simply and repeatedly, "[t]he role of a prosecutor is to see that justice is done." Connick v. Thompson, 131 S. Ct. 1350, 1365 (2011). "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935).

Mindful of this court's admonishment, "federal court equitable interference with state criminal proceedings should not be undertaken except in the most narrow and extraordinary of circumstances," Gilliam v. Foster, 75 F.3d 881, 903 (4th Cir. 1996) (en banc) (citing Younger v. Harris, 401 U.S. 37 (1971)), I nonetheless cannot ignore the ways in which the Commonwealth's misconduct has hindered rather than fostered justice throughout the course of this case. Although the "extraordinary circumstances" exception is narrow, this case -- wherein the Commonwealth's conduct has been appalling -- fits squarely into that narrow space.

A.

1.

I begin with the elementary propositions that habeas corpus is, "at its core, an equitable remedy," Schlup v. Delo, 513 U.S. 298, 319 (1995), and a district court has broad discretion to "dispose of habeas corpus matters 'as law and justice require,'" Hilton v. Braunskill, 481 U.S. 770, 775 (1987) (quoting 28 U.S.C. § 2243). See also Irvin v. Dowd, 366 U.S. 717, 728-29 (1961). For these reasons, our review of a district court's decision to bar re-prosecution is circumscribed. See D'Ambrosio v. Bagley, 656 F.3d 379, 390 (6th Cir. 2011) (stating that a district court's decision to bar re-prosecution would be reviewed for abuse of discretion).

Under an abuse of discretion review, we should not disrupt the court's remedy unless we believe it "act[ed] arbitrarily or irrationally, fail[ed] to consider recognized factors constraining its exercise of discretion, relie[d] on erroneous factual or legal premises, or commit[ted] an error of law." United States v. Wilson, 624 F.3d 640, 649 (4th Cir. 2010) (internal quotation marks omitted).

2.

As the majority notes, see ante at 30, the extraordinary circumstances exception has traditionally surfaced in cases in which a constitutional violation cannot be remedied by a new

36

trial.  See, e.g., Gilliam, 75 F.3d at 903 (re-prosecution would contravene the Double Jeopardy Clause); Solem v. Bartlett, 465 U.S. 463, 481 (1984) (state court lacked jurisdiction over the prosecution); Smith v. Goguen, 415 U.S. 566 (1974) (petitioner was convicted under an unconstitutional statute); Strunk v. United States, 412 U.S. 434, 439-40 (1973) (re-prosecution would violate petitioner's right to a speedy trial).

But some courts have also found the remedy appropriate in cases in which "other exceptional circumstances exist such that the holding of a new trial would be unjust."  Capps v. Sullivan, 13 F.3d 350, 352-53 (10th Cir. 1993).  These courts have relied on circumstances that demand equitable relief, even if those circumstances present constitutional violations that could be remedied upon retrial.  For example, in Satterlee v. Wolfenbarger, the Sixth Circuit held that a district court "may forbid reprosecution" where "the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period," or "the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial."  453 F.3d 362, 370 (6th Cir. 2006) (internal quotation marks and alterations omitted).  See also Wiggins v. Estelle, 681 F.2d 266, 268 n.1 (5th Cir. 1982) (suggesting petitioner should "forever be set free" if pre-indictment delay denied petitioner due process), rev'd on other grounds, McKaskle v. Wiggins, 465

37

U.S. 168 (1984); United States ex rel. Schuster v. Vincent, 524 F.2d 153, 154, 158, 162 (2d Cir. 1975) (ordering a habeas petitioner's immediate release and absolute discharge where he had been confined in a state hospital for over 30 years without the opportunity for a commitment hearing and had been in prison for a total of 44 years); Garcia v. Portuondo, 459 F. Supp. 2d 267, 294 (S.D.N.Y. 2006) (A court may bar retrial, even if the constitutional violation is capable of correction, "where the petitioner has served an extended and potentially unjustifiable period of incarceration before the writ was granted." (internal quotation marks and alterations omitted)); Morales v. Portuondo, 165 F. Supp. 2d 601, 609 (S.D.N.Y. 2001) (barring retrial where "the evidence strongly suggests that [the petitioners] are innocent," their "ability to defend against the charges in any new trial has been hampered" by unavailability of witnesses because of the state's delay, and they have "served extended and potentially unjustified periods of incarceration" (internal quotation marks omitted)).

Whether circumstances are "extraordinary" enough to bar re-prosecution is a fact-based determination, left to the sound discretion of the district court. See Foster v. Lockhart, 9 F.3d 722, 727 (8th Cir. 1993) ("A district court has authority to preclude a state from retrying a successful habeas petitioner when the court deems that remedy appropriate."). In this case,

38

I do not agree that the district court abused that discretion:

I am not as confident as the majority that the Commonwealth's

Brady and Giglio violations and subsequent misconduct can be

remedied in a new trial.  But even assuming they can be, the

circumstances at hand are extraordinary enough to demand

equitable relief in the form of a bar on re-prosecution.

B.

The district court's remedy was set forth in the Order

Enforcing Judgment as follows:

> The Commonwealth, having violated the Court's
> conditional writ of habeas corpus by failing to
> "within one-hundred and twenty (120) days of the date
> of this Order, provide Petitioner with a new trial, or
> release him unconditionally from custody," it is
> ORDERED that the Commonwealth of Virginia release
> Petitioner unconditionally, free of all criminal
> proceedings on the charge of murder for hire of Danny
> Petrole and the drug charges that were previously
> tried in state court by the Commonwealth, within ten
> (10) days of the entry of this order.
>
> It is FURTHER ORDERED that the Commonwealth of
> Virginia is hereby BARRED from reprosecuting the
> Petitioner on the charges originally tried herein in
> state court or any other charges stemming from death
> of Danny Petrole which requires the testimony of Owen
> Barber in any form.

J.A. 534-35.  The district court explained,

> As a starting point, the Court fully concedes
> that had the content of the Petitioner's Motion to
> Enforce Judgment been strictly limited to the
> Commonwealth's violation of the deadline set in this
> case, the question of the appropriate remedy would be
> an easy one.  The Court would order Wolfe's release,
> but he would be subject to rearrest and reprosecution
> by the Commonwealth.  However, the reality of this

39

case is very different than that of the ordinary case which constrains the Court to extraordinary remedies.

Id. at 525. The court proceeded to discuss two aspects of Wolfe's case that warranted a bar to re-prosecution: the Commonwealth's continuing pattern of misconduct, including flagrant and ubiquitous violations of Brady and Giglio; and the Commonwealth's jail visit to Owen Barber on September 11, 2012.

1.

First, I am compelled to set forth a sampling (though certainly not all) of the previous instances of misconduct perpetrated by the Commonwealth:

- The Commonwealth withheld the report composed by Detective Sam Newsome (the "Newsome Report"), which specifically stated, "I told [Barber] that he was potentially facing a capitol [sic] murder charge in this case and that he needed to help himself. . . . I told him I could not make any promises to him, but that the Commonwealth might entertain the idea of not charging him with Capitol [sic] Murder[.]" Wolfe v. Clarke, 691 F.3d 410, 417 (4th Cir. 2012) ("Wolfe II"). The Newsome Report also showed that the first mention that Wolfe had anything to do with Petrole's murder was raised by Detective Newsome, not by Barber himself;

- The Commonwealth withheld evidence that Barber possessed potential motives for murdering Petrole, see Wolfe v. Clarke, 819 F. Supp. 2d 538, 565 (E.D. Va. 2011);

- The Commonwealth withheld evidence that Barber's roommate, Jason Coleman, informed the prosecution that Barber had confessed to acting alone, see id.;

40

- The Commonwealth withheld evidence suggesting that Barber knew Petrole before the murder, that Barber owed Petrole money, that Petrole "had a hit out" on Barber, and that Barber had a close relationship with Petrole's roommate, id. at 548-49, 552;

- The Commonwealth withheld impeachment evidence, including information relating to a deal the Commonwealth made with its witness J.R. Martin in exchange for his cooperation, see id. at 549;

- The Commonwealth withheld a recorded statement made by its witness Chad Hough that conflicted with his trial testimony, see id. at 549;

- The Commonwealth withheld evidence which could have allowed Wolfe to present an alternate theory of the Petrole murder: various reports and witness statements relating to a parallel drug investigation that indicated conflict in Petrole's drug business unrelated to Wolfe's purported motive for having Petrole murdered; evidence that Petrole was rumored to be a government informant, constituting yet another possible motive for his murder; and the statements of three witnesses that they saw a second car at the crime scene shortly after the Petrole murder, see id. at 566, 558-59;

- When questioned why his office does not have an "open-file policy," a Commonwealth prosecutor offered "the flabbergasting explanation that he has 'found in the past when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what is provided.'" Wolfe II, 691 F.3d at 423. Thus, in Wolfe II, we found that the suppression of the Newsome Report "as well as other apparent Brady materials, was entirely intentional," id.;

- The district court found, "[t]he prosecutors choreographed and coordinated witness testimony through a series of joint meetings with Owen Barber and J.R. Martin, Owen Barber and Jennifer

41

Pascquierllo and Jason Coleman and Chad Hough." *Wolfe*, 819 F. Supp. 2d at 547. Further, the prosecutors did not provide any reference to or information regarding the joint meetings with witnesses in their written Brady disclosure, see id.;

- "Sergeant Pass, lead officer of the drug investigation relating to Wolfe and Petrole, submitted reports outlining the investigation of Petrole and others' drug activities to both the prosecutors and homicide investigators. Conway did not review all of the reports dealing with the drug investigation and he did not provide them to Petitioner," id. (citation omitted);

- The Commonwealth used Owen Barber's trial testimony "despite being on notice that it contained falsities," id. at 571 (emphasis supplied);

- In attempting to circumvent the district court's mandate that the retrial occur within 120 days or Wolfe be released unconditionally, the Commonwealth assured the state court that the "federal court expressly allows the Commonwealth 120 days from September 7, 2012, in which to institute retrial proceedings," J.A. 260; see also ante at 12.

The gravity of this list is startling, but the pattern of misconduct does not end there: it reached its pinnacle on September 11, 2012, when Detective Newsome and Prince William County prosecutors Richard Conway and Paul Ebert (the "Original Prosecuting Team") visited Barber in jail (the "September 11 jail visit") and attempted to coerce Barber to repeat his 2002 trial testimony upon retrial -- the same testimony that the district court found "contained falsities." *Wolfe*, 819 F. Supp. 2d at 571 ("Not only was the Commonwealth in possession of

42

information that would have revealed falsities in Barber's testimony at the time of the trial, it also knew that suppressing that information would result in denying Petitioner an opportunity to craft a defense based on the information.").

This time, however, Barber had enough. The district court explained,

> As Mr. Barber's counsel's testimony indicated during this Court's December 13, 2012 hearing, Mr. Barber, under advice of counsel and in consideration of the Original Prosecuting Team's [Sept. 11, 2012] conversation, has now invoked his Fifth Amendment privilege, which the Prince William County Circuit Judge authorized. As indicated by Barber's counsel, Barber intends to continue to invoke his Fifth Amendment privilege at Wolfe's retrial, absent the granting of immunity.

J.A. 527 (citations omitted). Thus, by threatening and intimidating Barber -- whose most recent and credited testimony was that Wolfe had nothing to do with Petrole's murder -- into invoking the Fifth Amendment, the Commonwealth has once again deprived Wolfe of potentially exculpatory evidence. This is a circumstance that, even if (somehow) the constitutional violations can be remedied upon retrial, is extraordinary enough "such that the holding of a new trial would be unjust." Capps, 13 F.3d at 353.

2.

In fashioning its remedy to bar re-prosecution, the district court relied heavily upon the actions of the Original Prosecuting Team during the September 11 jail visit, so it is important to put the visit in context. This court's Wolfe II opinion was published on August 16, 2012, and the mandate issued on Friday, September 7, 2012. Our Wolfe II opinion roundly chastised the Original Prosecuting Team for its failure to disclose exculpatory evidence and for "taint[ing]" evidence by its "prosecutorial misconduct." Wolfe II, 691 F.3d at 426 n.9. At that point, the Commonwealth was well on notice that a change in the prosecution team would be necessary to avoid any continued improprieties.

Yet, the day before a meeting with Wolfe's counsel (scheduled for Wednesday, September 12), the Original Prosecuting Team traveled to the Augusta Correctional Center and met with Barber, who was unassisted by counsel. The encounter was recorded without Barber's knowledge. The Commonwealth states that the Original Prosecuting Team visited Barber "in preparation for the retrial," and maintains, "Mr. Ebert was permitted, even required, to talk to Barber to see which of his many stories he intended to tell at the retrial." Resp't's Br. 6, 28.

44

Ebert received his answer within the first five minutes of the interview: "EBERT: What might be your testimony if we were to call you this time [upon retrial]? BARBER: I guess it'd have to be what was in the Federal Court." J.A. 298. Barber was referring to the testimony he gave at the district court evidentiary hearing in November 2010, where he reconfirmed that Wolfe was not "involved in the murder of Danny Petrole," did not "hire [Barber] to kill Danny Petrole" and did not "have anything . . . to do with the murder of Danny Petrole." Wolfe v. Johnson, No. 2:05-cv-432, Docket No. 186 at 117-18 (Tr. Nov. 2, 2010); see also Wolfe, 819 F. Supp. 2d at 548 & n.9. Crucially, the district court found "Barber's demeanor and candor persuasive" at the federal evidentiary hearing. Wolfe, 819 F. Supp. 2d at 570.

Nonetheless, the questioning did not stop there. Instead, because this was not the answer the Commonwealth wanted, they proceeded to interrogate, intimidate, and threaten Barber for over an hour, but at no point did Barber relent.

I am compelled to repeat some of the tactics used by the Commonwealth and statements made to Barber at the September 11 jail visit:

- Conway paraphrased the holding in the Supreme Court case Ricketts v. Adamson, 483 U.S. 1 (1987), explaining that a government witness who breached a plea agreement by failing to testify truthfully against other parties "was convicted

45

of first degree murder and sentenced to death." Conway asked, "Nobody, none of these people [i.e., Wolfe's attorneys] ever told you that by breaching the plea agreement you could be tried again also . . . for the murder[?] . . . I had thought it was pretty deceptive really for these people to be coming here and talking to you as if perjury was the only thing you had to worry about."  J.A. 310-14.

- DETECTIVE NEWSOME: "You know, . . . sometimes you may feel like well, if I'm going down, there's no need to take [Wolfe] with me.  So I'll just tell this lie to make it easier on him.  And I'm saying this may come from the heart in an effort to do good, to try and do good, and say well even though you may know he's guilty, I'm just going to say this because it will make his life easier. Why should somebody else suffer also?  I will take the brunt of this.  **But justice doesn't work like that.  And nor does God work like that.  We are held accountable for our actions.  Scripture tells us to obey the laws of the land.  We have an obligation to do that.  And our obligation before anything else is to be righteous and truthful in our practices and in what we do.  And we're told in scripture also that those with authority over us are put there by holy mandate. So we have an obligation to respect the Courts, to respect the process and to do what's right.** And we do not have the moral ability to arbitrarily protect those who are guilty, who are held accountable."  Id. at 331 (emphasis supplied).

- CONWAY:   "It doesn't matter what the victim's family thinks about now because we've gotten somebody off of death row so it's a victory and the Lord will forgive us for that.  But let me tell you something, I don't know -- I don't know if the Lord's all that forgiving or not."  Id. at 354.

- CONWAY: "I'm not trying to trick you or anything, but do you remember what you answered [when you were asked why you killed Petrole]?"  BARBER: "No.  What did I say?"  CONWAY: "Do you know why

46

you don't remember?   Because it wasn't the truth."  <u>Id.</u> at 361.

- DETECTIVE NEWSOME: "You know, what Mr. Conway said about do you think if you told the truth that you could convince somebody that it's the truth. . . .  But this is something that you and you alone can have an impact on and it has to come from in there.  And that is a plausible and truthful explanation for those multitude of changes.  A plausible and truthful explanation of why you told the truth in the initial trial, you told the truth in letters, but in these affidavits, why you changed.  It has to be truthful and plausible[.]"  <u>Id.</u> at 367-68.

- CONWAY: "You know what the truth is, Owen.  It's something that we should have ingrained in you more, I guess, back then.  We thought we had."  <u>Id.</u> at 369.

- CONWAY: "So you need to really search your sole [sic] and if we're full of shit and Justin Wolfe didn't have anything to do with all this, you should tell us that right this minute and tell us to get out because you did it all on your own and he never had a thing to do with it.  But if you want -- if you believe in yourself and you believe in the truth and that you believe that from now on nothing but the truth will ever escape your lips, then I think that's different."  <u>Id.</u> at 370-71.

- EBERT: "One more thing I want you to think about, what do you think your mother would want you to do?"  <u>Id.</u> at 375. (Barber's mother died of cancer a year before Barber killed Petrole, and the Original Prosecuting Team knew this fact because they read aloud a previous statement of Barber's, which said, "I had just lost my mother the year before [Petrole's death] after cancer [was] slowly eating her away," <u>id.</u> at 302).

The very next day, on September 12, 2012, Conway and Ebert filed an ex parte motion to recuse themselves and were replaced

47

on September 13 by a Fairfax County Commonwealth prosecutor. The timing of this action is highly suspect, as it suggests that, rather than working diligently to comply with the district court's mandate that Wolfe be released or retried within 120 days, the Original Prosecuting Team made a last-ditch effort to intimidate Barber into implicating Wolfe once and for all, and then, when their plans failed, the prosecutors immediately filed a motion to recuse themselves.[1]

Considering this cumulative evidence of misconduct, culminating in the Commonwealth urging Barber to reiterate testimony that "contained falsities," and his resulting intention to invoke his Fifth Amendment privilege, I simply cannot join the majority's independent finding that this is not an "extremely rare" situation worthy of a bar on re-prosecution.

---

[1] The district court asked the Commonwealth, "Did the [prosecutors'] recusal on September the 12th have anything to do with the visit on September 11th of Mr. Barber?" The Commonwealth, represented by the Attorney General's Office, responded, "I can only speak to the record, your Honor. There's nothing I see in the transcript or in my listening to the recording of the visit that would have created the basis for them to recuse themselves." J.A. 456. The Commonwealth continued, "[T]he history of the case to that point and the criticism that had been leveled at them would be a distraction in continuing the prosecution of the case, and a special prosecutor would be able to focus on the case itself," to which the court responded, "It took the Commonwealth until September the 12th to figure that out?" Id. at 457.

48

Ante at 30.  Woe is the state of justice in the Commonwealth if this behavior is not extremely rare.

3.

The majority makes the point that Barber may very well not end up invoking his Fifth Amendment privilege, and if he does testify, his testimony could benefit either side.  See ante at 28.  However, in my opinion, this misses the point.  The September 11 jail visit, resulting in Barber's threat of silence, was not an anomaly; it "permanently crystalized" the misconduct of the Original Prosecuting Team, J.A. 533, as the district court explained,

> In the absence of the discovery violations in the state trial, the Original Prosecuting Team's actions on September 11, 2012 might appear to be benign. However, in context, they speak to a continuing pattern of violating Petitioner [sic] right to use Brady and Giglio evidence, which the Court attempted to remedy through its habeas decree.

Id. at 528.

As it stands, the only witness directly linking Wolfe to the death of Petrole -- Barber -- has now recanted and, as a result, has been sought out and harassed by the Commonwealth attorneys to the extent he is now chilled from testifying.  In fact, in December 2012, Barber's attorney testified in district court that, upon his advice, Barber has already invoked his Fifth Amendment privilege in state court, and "based on the contents of th[e] tape [from the September 11 jail visit], my

49

advice will not change about whether [Barber] should testify [at trial] unless there's a new development[.]"  J.A. 471-72.

But even if Barber decides to forego the privilege, his testimony will be forever shadowed by the manipulative actions of the Original Prosecuting Team:  the Commonwealth threatened Barber with being charged with capital murder for breaching his plea agreement and raised the specters of God and Barber's deceased mother in attempt to coerce him into testifying to "the truth," a.k.a., the Commonwealth's moniker for its version of the facts.  See J.A. 310-14, 331, 369, 375.  It is the Commonwealth alone that now holds the fate of the crucial Barber testimony (and thus, Wolfe's fate) in its grip.  They alone can grant immunity (or not) in order to compel Barber's testimony.[2] Yet, it is clear from the actions and statements of the

_____

[2] I am not satisfied by the suggestion that a state court grant of immunity would result in Barber offering testimony. See Gosling v. Commonwealth, 415 S.E.2d 870, 874 (Va. Ct. App. 1992) ("When a witness 'declares his belief that the answer to the question would [in]criminate, or tend to [in]criminate him, the court cannot compel him to answer, unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer cannot possibly have such tendency.'" (quoting Temple v. Commonwealth, 75 Va. 892, 898 (1881)); see also Byrd v. Commonwealth, No. 2550-02-1, 2003 WL 23021981 (Va. Ct. App. Dec. 30, 2003) ("Even had the trial court granted Spain use immunity, however, it could not compel him to testify if he decided to assert his Fifth Amendment privilege." (citing Gosling, 415 S.E.2d at 873; Va. Code Ann. § 19.2-270)).

Commonwealth prosecutors that the only testimony they are interested in compelling is that which would implicate Wolfe.

The misconduct of the Original Prosecuting Team has tainted this case to the extent that Wolfe's due process rights are all but obliterated. In this case, with its "protracted and eventful history," ante at 3, not only do we have inexcusable delay as set forth in Satterlee, Garcia, and Morales -- caused by the Commonwealth's withholding of Brady and Giglio evidence and its non-compliance with the district court's 120-day deadline -- but we also have the grievous instances of prosecutorial misconduct to boot. Wolfe has been in prison for twelve years, despite the fact that the evidence linking him to Petrole's murder is weak, and he will now likely be deprived of live testimony from the only direct witness to the crime for which he is sitting on death row -- testimony that may very well exculpate him. Thus, the district court was not arbitrary or irrational, did not ignore constraints on its discretion, and did not commit factual or legal error in stopping this loathsome spectacle once and for all. See United States v. Wilson, 624 F.3d 640, 649 (4th Cir. 2010).[3]

---

[3] The majority maintains, "contentions relating to Barber's alleged intimidation by the prosecutors are yet to be exhausted in the state court system." Ante at 29 (citing Pitchess v. Davis, 421 U.S. 482 (1975)). However, Pitchess is inapposite. As noted in Part III.A. of the majority opinion, the (Continued)

51

II.

In sum, the district court -- possessing jurisdiction to remedy the constitutional violations that occurred over the past twelve years and armed with the authority to "enforc[e] its conditional grant of a writ of habeas corpus," Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir. 2006) -- disposed of this matter "as law and justice require[d]," 28 U.S.C. § 2243, and did not abuse its discretion in barring re-prosecution of Justin Wolfe. I would affirm the district court's remedy and thus, respectfully dissent as to Part III.B. of the majority opinion.

I repeat the words of our Supreme Court, "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United

---

Commonwealth did not comply with the conditional writ in this case. In such a situation, jurisdiction remains in the district court so that it may "enforce its conditional grant of a writ of habeas corpus." Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir. 2006); see also D'Ambrosio v. Bagley, 656 F.3d 379, 385 (6th Cir. 2011) ("[T]he state never complied with the conditional writ, and the district court's jurisdiction remained intact[.]"). In Pitchess, the state complied with the district court's writ, thereby depriving the district court of jurisdiction over further proceedings and rendering exhaustion of the utmost importance. In contrast, because the September 11 jail visit occurred while the Commonwealth was under the thumb of the district court's writ, Pitchess's exhaustion requirement does not preclude the district court's consideration of the September 11 jail visit in deciding how best to fashion a remedy for failure to satisfy its own writ.

52

States, 295 U.S. 78, 88 (1935). Even Detective Newsome recognized that the Commonwealth "ha[s] an obligation to respect the Courts, to respect the process and to do what's right." J.A. 331. If only the Commonwealth had practiced what it preached.